**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| RICHARD O'BRINGER, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>US CLAIMS CAPITAL, LLC. d/b/a US CLAIMS,<br><br>Defendant. | **CASE NO. _______________**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Richard O'Bringer ("Plaintiff"), individually and on behalf of all similarly situated persons, brings this action against Defendant US Claims Capital, LLC d/b/a US Claims. ("USCC" or "Defendant"), alleging the following based on personal knowledge as to his own experiences and, upon information and belief, derived from, among other sources, an investigation by her counsel and a review of public records as to all other matters.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against USCC for its failure to adequately secure and protect the personally identifiable information ("PII") and protected health information ("PHI") of Plaintiff and other similarly situated USCC customers. This sensitive data—including Social Security numbers, addresses, dates of birth, driver's license numbers, government-issued ID numbers, financial information (including credit/debit card numbers), medical information, and health insurance information (collectively, "Private Information")—was left vulnerable to criminal hackers due to USCC's inadequate security measures.

2. On or about April 11, 2025, USCC issued data breach notification letters (the

"Notice") to individuals whose information had been compromised in the hacking incident, including to the Plaintiff.[1]

3. According to the Notice sent to Plaintiff and the "Class Members" (defined below), Defendant detected unusual activity on certain computer systems on or about January 7, 2025. In response, Defendant initiated an investigation, which later confirmed on March 25, 2025, that an unauthorized party had accessed files containing sensitive customer information (the "Data Breach"). Despite this discovery, USCC waited more than three months notifying the public, leaving those affected unaware of their exposure and at risk.

4. Due to this delay, Plaintiff and Class Members remained unaware for three months that their Private Information had been compromised, leaving them vulnerable to an ongoing and substantial risk of identity theft, fraud, and other personal, social, and financial harms. This risk is not temporary but will persist for the rest of their lives.

5. The Private Information compromised in the Data Breach contained highly sensitive customer data, representing a gold mine for data thieves. The data included, but is not limited to, Social Security numbers, addresses, dates of birth, driver's license numbers, government-issued ID numbers, financial information.

6. With the stolen Private Information obtained in the Data Breach—and a significant head start—data thieves can perpetrate a wide range of crimes, including but not limited to: opening fraudulent financial accounts in Class Members' names, securing loans under their identities, obtaining medical services using their information, fraudulently applying for government benefits, filing false tax returns, acquiring driver's licenses with Class Members' names but another individual's photograph, and providing false identification to law enforcement

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/756f8399-0790-4f38-9d84-49896b0799a2.html

during an arrest.

7. There has been no assurance offered by USCC that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

8. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the forms of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9. Plaintiff brings this class action lawsuit to address USCC's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

10. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to USCC, and thus USCC was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

11. USCC failed to implement adequate security practices for the computer networks and systems housing the Private Information. Proper network monitoring would have enabled USCC to detect the Data Breach sooner.

12. Plaintiff's and Class Members' identities are now at risk because of USCC's negligent conduct as the Private Information that USCC collected and maintained is now in the hands of data thieves and other unauthorized third parties.

13. Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

14. Accordingly, Plaintiff, on behalf of themselves and the Class, assert claims for Negligence, Negligence *Per Se*, Breach of Implied Contract, and Unjust Enrichment.

## **PARTIES**

15. Plaintiff O'Bringer is, and at all relevant times has been, a resident and citizen of the State of Nevada, where he resides with the intent to remain indefinitely.

16. Defendant US Claims Capital, LLC maintains its principal place of business at 4850 T-Rex Avenue, Suite 101, Boca Raton, Florida.

## **JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), et seq. The amount in controversy exceeds $5,000,000, exclusive of interest and costs. The proposed Class includes more than 100 members, and at least one member of the Class is a citizen of a state different from that of Defendant. Plaintiff O'Bringer is a citizen of the State of Nevada, and Defendant US Claims Capital, LLC is a citizen of the State of Florida. Accordingly, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over Defendant because Defendant's principal places of business is located within this District and the Defendant conducts substantial business in this district.

19. Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and Defendant resides within this judicial district.

## **FACTUAL ALLEGATIONS**

***A. USCC's Business.***

20. USCC is a pre-settlement financial firm based in Florida. Founded in 1996. It offers financial services to personal injury victims of auto accidents, workplace and construction accidents, premises liability, and medical malpractice.[2] A longtime member of the industry trade group the American Legal Finance Association (ALFA), USCC supports injured plaintiffs and their attorneys by purchasing a portion of the anticipated recovery, providing the plaintiff with means to pay bills and make it through the litigation process.[3] Headquartered in Boca Raton, Florida, USCC employs over 50 individuals.

21. As a condition of doing business with USCC, USCC requires customers to entrust it with highly sensitive personal and health information. In the normal course of their interactions with USCC, the Plaintiff and Class Members were obligated to provide this private information.

22. In its Privacy Policy, USCC it states it "maintain[s] electronic, procedural, and physical safeguards to guard your nonpublic information."[4]

23. By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, USCC assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

24. Plaintiff and Class Members relied on USCC to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information,

---

[2] https://www.linkedin.com/company/us-claims/about/

[3] *Id.*

[4] https://usclaims.com/privacy-policy/#:~:text=We%20restrict%20access%20to%20your,you%20may%20request%20from%20us.

which Defendant ultimately failed to do.

***B. The Data Breach and USCC's Failure to Provide Adequate Notice to the Plaintiff and Class Members.***

25. According to Defendant's Notice, it became aware of unauthorized access to its computer systems on January 7, 2025. *See* Exhibit A.

26. Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, Social Security numbers, addresses, dates of birth, driver's license numbers, government-issued ID numbers, financial information (including credit/debit card numbers), medical information, and health insurance.

27. On or around April 11, 2025—more than three months after USCC first learned that the Class's Private Information had been accessed by cybercriminals—USCC finally began notifying customers that its investigation had confirmed their Private Information was compromised.

28. Plaintiff and Class Members provided their Private Information to USCC with the reasonable expectation and mutual understanding that USCC would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

29. USCC's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

30. USCC knew or should have known that its electronic records would be targeted by cybercriminals.

***C. USCC Failed to Comply with FTC Guidelines.***

31. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

32. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

33. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

34. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify

the measures businesses must take to meet their data security obligations.

35. The Data Breach demonstrates USCC's failure to implement fundamental data security practices. Its inability to adopt reasonable and appropriate measures to protect against unauthorized access to the Plaintiff's and Class Members' Private Information constitutes an unfair act or practice, as prohibited by Section 5 of the FTC Act.

36. USCC was fully aware of its obligation to protect the Private Information of its customers but failed to meet those responsibilities. The Defendant was also cognizant of the serious repercussions that would arise from its failure to do so.

***D. USCC's Failure to Adhere to Industry Standards.***

37. As referenced above, Cybersecurity experts consistently identify businesses as prime targets for cyberattacks due to the valuable Private Information they collect and maintain.

38. The Center for Internet Security (CIS) Critical Security Controls (CSC) outlines essential best practices for securing data and preventing cyberattacks. These include controls such as Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account and Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[5]

39. The National Institute of Standards and Technology ("NIST") also recommends

---

[5] *The 18 CIS Critical Security Controls*, Center For Internet Security, https://www.cisecurity.org/controls/cis-controls-list (last visited on April 17, 2025).

certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

40. The Cybersecurity and Infrastructure Security Agency (CISA) recommends organizations take specific measures to defend against cyberattacks, including: (a) requiring multi-factor authentication for remote and privileged access, ensuring software is updated, and disabling unnecessary ports and protocols; (b) enabling cybersecurity personnel to detect unusual network behavior and ensuring antivirus software is up to date; and (c) ensuring preparedness for incident response in the event of an intrusion.[6]

41. Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-

---

[6] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited April 17, 2025).

06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls, which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

***E. USCC's Failure to Safeguard the Plaintiff's and Class Members' Private Information.***

42. In addition to its obligations under federal and state laws, USCC owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. USCC owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

43. USCC breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. USCC's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of its customers' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as

discussed above; and

g. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

44. USCC negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

45. Had USCC remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

46. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What is more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with USCC.

***F. USCC Should Have Known That Cybercriminals Target PII and PHI for Fraud and Identity Theft.***

47. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[7]

48. Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment.

---

[7] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury- workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on April 17, 2025).

Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

49. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

50. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.

51. As technology advances, computer programs can now scan the internet more broadly, creating a mosaic of information that links compromised data to individuals in ways that were previously impossible. This is known as the "mosaic effect." Personal details such as names, dates of birth, and contact information—like phone numbers and email addresses—are highly valuable to hackers and identity thieves, as they can be used to gain access to other accounts.

52. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

53. For these reasons, the FTC recommends that identity theft victims take several

time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[18] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

54. Indeed, the PII and PHI of individuals remain of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[8]

55. Further, even information such as names, email addresses and phone numbers can have value to a hacker. Beyond things like spamming affected individuals, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[9]

56. Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that

---

[8] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how- much-it-costs (last visited on April 17, 2025).

[9] *See Dark Web Price Index: The Cost of Email Data,* MAGICSPAM, https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on Jan. 17, 2025).

address may become cumbersome or impossible to use, making it less valuable to its owner.

57. One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[10]

58. Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of information can be derived not only by a price at which consumers or hackers actually seek to sell it, but also by the economic benefit consumers derive from being able to use it and control the use of it.

59. An individual's ability to use their PII and PHI is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII and PHI in the Data Breach led to a diminution in value of that data.

60. Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs his ability to participate in the economic marketplace.

61. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[11]

---

[10] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

[11] *2023 Consumer Impact Report* (Jan. 2024), Identity Theft Resource Center, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited on April 17, 2025).

62. It is important to note that there can be a significant time lag between when harm occurs and when it is discovered, as well as between the theft of PII and PHI and its eventual use. According to a study conducted by the U.S. Government Accountability Office on data breaches:[12]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

63. PII and PHI are valuable commodities to identity thieves because once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

64. And while credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the InfoSec Institute.[13]

65. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

66. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing

---

[12] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited on April 17, 2025).

[13] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on April 17, 2025).

and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[14]

67. The ramifications of USCC's failure to keep its customers' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

68. Here, not only was sensitive medical information compromised, but Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

69. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**I. *Plaintiff O'Bringer's Experiences***

70. Plaintiff O'Bringer was a customer of USCC. As a condition of receiving services, he was required to provide the Defendant with his Private Information. In doing so, Plaintiff reasonably expected that his information would be safeguarded and not accessed by unauthorized third parties.

---

[14] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on April 17, 20205).

71. Plaintiff O'Bringer received USCC's Data Breach notice. The notice informed Plaintiff that his Private Information was improperly accessed and obtained by third parties. *See* Exhibit A.

72. As a result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

73. As a result of the Data Breach, Plaintiff suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

74. Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

75. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of

identity theft and fraud for years to come.

## CLASS ACTION ALLEGATIONS

76. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

77. Plaintiff proposes the following Class, subject to amendment as appropriate:

> **All U.S. citizens whose Private Information was accessed and/or compromised as a result of the Data Breach, including those who received notice of the breach (the "Class")**.

78. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

79. Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

80. The proposed Class meets the prerequisite criteria for certification under Fed. R. Civ. P. 23.

81. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands customers of USCC whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through USCC's records, Class Members' records, publication notice, self- identification, and other means.

82. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether USCC engaged in the conduct alleged herein;

b. Whether USCC's conduct violated the FTCA, HIPAA, and/or Illinois Consumer Fraud and Deceptive Business Practices Act;

c. When USCC learned of the Data Breach

d. Whether USCC's response to the Data Breach was adequate;

e. Whether USCC unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f. Whether USCC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether USCC's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether USCC's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether USCC owed a duty to Class Members to safeguard their Private Information;

j. Whether USCC breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether USCC had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether USCC breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n. Whether USCC knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiff and Class Members suffered as a result of USCC's misconduct;

p. Whether USCC's conduct was negligent;

q. Whether USCC was unjustly enriched;

r. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring, as well as monetary relief; and

t. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the creation of a constructive trust.

83. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of USCC. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

84. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

85. Predominance. USCC has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from USCC's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

86. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for USCC. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

87. Class certification is also appropriate because USCC acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

88. All members of the proposed Class are readily ascertainable. USCC has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by USCC.

**<u>COUNT I</u>**
**NEGLIGENCE**
**(On Behalf Of Plaintiff And The Class)**

89. Plaintiff incorporates by reference the General Allegations set forth above.

90. USCC knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

91. USCC's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

92. USCC knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. USCC was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

93. USCC owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. USCC's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA, the FTCA and the Illinois Consumer Fraud and Deceptive Business Practices Act;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

94. USCC's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

95. USCC's duty also arose because Defendant was bound by industry standards to protect its customers' confidential Private Information.

96. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and USCC owed them a duty of care to not subject them to an unreasonable risk of harm.

97. USCC, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within USCC's possession.

98. USCC, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

99. USCC, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

100. USCC breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the

potential for identity theft and other damages.

101. USCC acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

102. USCC had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust USCC with their Private Information was predicated on the understanding that USCC would take adequate security precautions. Moreover, only USCC had the ability to protect its systems (and the Private Information that it stored on them) from attack.

103. USCC's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, as alleged herein.

104. USCC's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

105. As a result of USCC's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

106. USCC also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

107. As a direct and proximate result of USCC's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

108. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

109. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

110. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring USCC to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf Of Plaintiff And The Class)**

111. Plaintiff incorporates by reference the General Allegations set forth in Paragraphs 1 through 87.

112. Pursuant to Section 5 of the FTCA, USCC had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

113. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., USCC had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

114. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

115. USCC breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

116. Specifically, USCC breached its duties by failing to employ industry-standard

cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

117. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of USCC's duty in this regard.

118. USCC also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

119. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to USCC's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

120. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and USCC's failure to comply with both constitutes negligence *per se*.

121. Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to USCC's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

122. As a direct and proximate result of USCC's negligence *per se*, Plaintiff and the

Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

123. As a direct and proximate result of USCC's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

124. In addition to monetary relief, Plaintiff and Class Members are entitled to injunctive relief requiring USCC to, among other things, enhance its data security systems and monitoring procedures, conduct regular audits of these systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf Of Plaintiff And The Class)**

125. Plaintiff incorporates by reference the General Allegations set forth in Paragraphs 1 through 87.

126. USCC provides financial services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

127. Through Defendant's sales with Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

128. As consideration, Plaintiff and Class Members paid money and turned over

valuable Private Information to USCC. Accordingly, Plaintiff and Class Members bargained with USCC to securely maintain and store their Private Information.

129. USCC accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

130. In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiff and Class Members intended and understood that USCC would adequately safeguard the Private Information as part of those services.

131. Defendant's implied promises to Plaintiff and Class Members include, but are not limited to: (1) ensuring that anyone granted access to Private Information also safeguards its confidentiality; (2) restricting access to Private Information within its organization to those with a legitimate business need; (3) limiting access to qualified and trained employees or agents; (4) establishing and enforcing retention policies to protect against criminal data breaches; (5) implementing appropriate encryption measures; (6) requiring multifactor authentication for access; (7) adhering to HIPAA standards to ensure the protection of Plaintiff's and Class Members' PHI; and (8) taking additional steps to prevent foreseeable data breaches.

132. Plaintiff and Class Members would not have entrusted their Private Information to USCC in the absence of such an implied contract.

133. Had USCC disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to USCC.

134. As a provider of healthcare, USCC recognized (or should have recognized) that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and

that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

135. USCC violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information. USCC further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

136. Additionally, USCC breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

137. USCC also breached the implied contracts with Plaintiff and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1).

138. USCC further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1).

139. USCC further breached the implied contracts with Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii).

140. USCC further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2).

141. USCC further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3).

142. USCC further breached the implied contracts with Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 C.F.R. § 164.306(a)(94).

143. USCC further breached the implied contracts with Plaintiff and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, *et seq*.

144. USCC further breached the implied contracts with Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. § 164.530(c).

145. USCC further breached the implied contracts with Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PHI.

146. A meeting of the minds occurred, as Plaintiff and Class Members agreed to provide payment and/or accurate, complete Private Information to USCC in exchange for USCC's commitment to, among other things, deliver services that included safeguarding their highly sensitive Private Information.

147. Plaintiff and Class Members have suffered damages as a result of USCC's conduct, including the harms and injuries stemming from the Data Breach, both present and future, as detailed herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf Of Plaintiff And The Class)**

148. Plaintiff incorporates by reference the General Allegations set forth in Paragraphs 1 through 87.

149. This Count is plead in the alternative to Count III.

150. Plaintiff and Class Members conferred a benefit on USCC by turning over their Private Information to Defendant and by paying for services to Defendant that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

151. Upon information and belief, USCC funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

152. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to USCC.

153. USCC has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

154. USCC knew that Plaintiff and Class Members conferred a benefit upon it, which USCC accepted. USCC profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

155. If Plaintiff and Class Members had known that USCC had not adequately secured

their Private Information, they would not have agreed to provide such Private Information to Defendant or obtained services with Defendant.

156. Due to USCC's conduct alleged herein, it would be unjust and inequitable under the circumstances for USCC to be permitted to retain the benefit of its wrongful conduct.

157. As a direct and proximate result of USCC's conduct, Plaintiff and Class Members have and will suffer injuries, as alleged herein.

158. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from USCC and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by USCC from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

159. Plaintiff and Class Members may not have an adequate remedy at law against USCC, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are a proper representative of the proposed Class;

B. For injunctive and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. For an award of compensatory, consequential, and general damages,

including nominal damages, as allowed by law in an amount to be determined;

D. For an award of restitution or disgorgement, in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED: April 17, 2025

Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-332-4200
ostrow@kolawyers.com

Sabita J. Soneji*
*ssoneji@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

**pro hac vice forthcoming*

*Counsel for Plaintiff and the Proposed Class*